UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

CHARLES LAVON WHITMORE,

                                        Plaintiff,                    20-CV-08435 (SN)

                    -against-                                         OPINION & ORDER

KILOLO KIJAKAZI,

                                        Defendant.

-----------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** __ 3/31/2022 __

SARAH NETBURN, United States Magistrate Judge:

   Plaintiff, Charles Lavon Whitmore, seeks judicial review of the determination of the

Commissioner of Social Security (the "Commissioner") that he was not entitled to Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act. See 42 U.S.C. § 405(g).

The parties cross-moved for judgment on the pleadings. The Commissioner's motion is

GRANTED, and the Plaintiff's motion is DENIED.

## BACKGROUND

### I.    Administrative History

   Whitmore applied for DIB on March 2, 2017. ECF No. 26, Administrative Record ("R.")

81, 224. He alleged that he was disabled beginning November 24, 2015, due to issues with his

right shoulder, cervical spine, and stomach, as well as hypertension. R. 81, 238. His application

was denied on April 20, 2017, and he requested a hearing before an administrative law judge

("ALJ") to review his case. R.156, 168–69. Whitmore appeared for a hearing before ALJ Henry

Kramzyk on March 5, 2019, who issued a decision denying the claim on April 26, 2019. R. 81,

94. On August 25, 2020, the Appeals Council denied Whitmore's request for review, making the ALJ's decision final. R. 1–5.

## II.     Whitmore's Civil Case

Whitmore filed his complaint on October 15, 2020, seeking review of the ALJ's decision. See ECF No. 6. He requests that the Court set aside the decision and grant him DIB or, alternatively, remand the case for further proceedings. ECF No. 27, Plaintiff's Memorandum of Law ("Pl. Br.") at 1. The Commissioner answered by filing the administrative record, and the parties cross-moved for judgment on the pleadings. See ECF Nos. 26, 27, 31. Whitmore argues that the ALJ's decision was not supported by substantial evidence. Pl. Br. at 1. The Commissioner responds that the decision was supported by substantial evidence, and Whitmore failed to demonstrate that he is disabled. See ECF No. 32.

The Honorable Paul A. Engelmayer referred this case to my docket and the parties consented to my jurisdiction, pursuant to 28 U.S.C. § 636(c). ECF Nos. 8, 20.

## III.    Factual Background

### A.  Non-Medical Evidence

Whitmore was born on May 12, 1966, and was 49 at the time of the alleged onset of his disability. R. 106. He completed the 12th grade and previously worked as a construction worker, a hand packager for a grocery supplier, and a deliveryman. Id. at 107–17. His last position as a construction worker required lifting 50–60 pounds. Id. at 110. He was laid off in September 2015 and remained on the work list for his union for some period after. Id. at 108. At the hearing, Whitmore testified that he was unable to work because of his shoulder condition, sleep apnea, and carpal tunnel syndrome. Id. at 117–18.

Whitmore testified that he suffers from pain in his right shoulder, right hand, neck, and back, rating the pain a five or six on a ten-point scale. Id.  at 118–19. He takes Oxycodone to manage his pain, which makes him drowsy. Id. at 119–20. He reported that he could carry or lift a maximum of only 25 pounds with his left arm and could not lift anything with his right arm. Id. at 120–21. Because of the numbness in his right hand, Whitmore could no longer use it to perform basic tasks, including opening jars. Id. at 121. Whitmore further testified that he could walk only one to two blocks without resting and can stand for only 20 minutes at a time. Id. He can sit for a maximum of 30 minutes. Id.

Regarding his daily activities, Whitmore – who shares an apartment with his mother – testified that he performs limited chores, including minimal cleaning and washing (but not folding) his laundry. Id. at 122. He has some difficulty dressing himself and tying his shoes. Id. at 128. Whitmore uses public transit and has traveled outside the state to visit his grandchildren. Id. at 123. He maintains good relationships with family members, and he enjoys reading sports magazines and watching television. Id. at 124–25. He can send very brief text messages. Id. at 125.

Vocational expert Tricia Muth also testified. She classified Whitmore's past work as a construction worker as exertionally heavy, his work as a hand packager as exertionally medium, and the exertional level of his work as a deliveryman ("light truck driver") as medium, but heavy as performed. Id. at 131. The ALJ presented Muth with four scenarios and asked her to testify as to whether the hypothetical claimant would be capable of performing past work or any other work in the national economy. The first hypothetical assumed a claimant of the same age, education, and work experience as Whitmore, who had the ability to lift carry, push, pull up to 20 pounds occasionally and 10 pounds frequently, sit for a total of up to six hours a day, and

stand and/or walk for a total of up to six hours a day. Id. at 133. In addition, the hypothetical individual could never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, and occasionally balance and stoop, but never crouch, kneel, or crawl. Id. Furthermore, the claimant could do frequent reaching overhead and in all directions with the right dominant upper extremity and frequent handling with the right dominant hand but needed to avoid concentrated exposure to vibration and all exposure to hazards such as dangerous machinery and unprotected heights and could not drive vehicular equipment. Id. Muth testified that such an individual would be unable to perform any past work, but that he could work as a small parts assembler, a cashier, and as an inspector and hand packager. Id. at 133–34. In cross-examination, Whitmore's attorney asked whether, if the claimant could only reach and handle items "occasionally" rather than "frequently," the three jobs would be available. Id. at 138. Muth responded that they would not. Id.

Second, Muth was asked to assume a hypothetical clamant with the same age, education, work experience, and restrictions as the claimant in the prior hypothetical, but additionally could not reach overhead with his right dominant upper extremity and was limited to frequent reaching in all other directions. Id. at 134. Muth responded that the claimant could not perform any prior work, but could work as a small parts assembler, cashier, or electronics worker. Id. at 135. She testified that there are, respectively, 196,000, 1,276,000, and 30,000 of these positions available in the national economy. Id. at 134–35. In cross-examination, Muth admitted that these three jobs would not be available if the claimant could only perform occasional reaching, and if he would be off-task 15 percent of the time. Id. at 138–39.

Third, the ALJ asked Muth to consider an individual with same limitations as the claimant in the second hypothetical, but with the additional restrictions that the individual could

only lift, carry, push, and pull up to 10 pounds occasionally and lesser weights frequently, sit for

a total of six hours a day, and stand or walk for a total of two hours a day. Id. at 136. Muth

testified that such an individual could not perform any past work, but could work as a charge

account clerk, document preparer, or final assembler. Id. at 136–37. She added that there were no

jobs that could be performed at the sedentary level that would utilize Whitmore's transferrable

skills. Id. at 137.

In the final hypothetical, Muth was asked to assume a claimant with the same limitations

as in the third hypothetical. However, because of his impairments, this claimant would be unable

to work approximately one day a week. Id. at 137. Muth testified that this hypothetical claimant

could not perform any past work or other jobs in the national economy. Id.

## B.  Treating Medical Evidence

### 1.  Pre-Onset Medical Evidence

The administrative record contains extensive evidence from 2010 and 2011, four years

before Whitmore's alleged onset date of November 24, 2015. Whitmore was involved in a car

accident in October 2010 that resulted in an immediate onset of neck and low back pain. R. 526.

He received chiropractic care between November 2010 and February 2011, id. at 539–40, and

underwent shoulder surgery on April 6, 2011, to address, among other injuries, the internal

derangement of the right shoulder, a partial tear of the supraspinatus and infraspinatus tendon, a

SLAP lesion, and a labral tear. Id. at 525. In addition, an MRI performed in February 2011 found

a left facet joint arthropathy in the cervical spine and right facet joint arthropathy, bilateral facet

joint arthropathy, anterior wedging, developmental foraminal narrowing, and narrowing of the

right sacral foramen in the lumbar spine. Id. at 557, 558. Following his surgery, Whitmore was

reevaluated by his chiropractor, Christopher Whyte, who opined that the accident had resulted in

"severe residual inflammatory pathology to the muscular and supportive structures of the cervical and lumbar spine" and that Whitmore's disability is "partial, permanent and has a tendency to result in chronic pain with progressive remissions and exacerbations during the overuse of his neck and back." Id. at 532.

### 2. Dr. Konrad Izumi Gruson

On December 7, 2016, Whitmore underwent a total right shoulder arthroplasty surgery performed by Dr. Gruson. R. 301. At Whitmore's presenting physical exam, Dr. Gruson observed that the shoulder range of motion was slow and painful and noted the sound of crepitus. Id. An MRI indicated that Whitmore suffered from end stage glenohumeral arthritis of the shoulder. Id. The surgery was performed without complication, and Dr. Gruson reported that after surgery, Whitmore progressed well with physical and occupational therapy. Id. In a report to the public assistance program, Dr. Gruson noted that Whitmore was "temporarily unemployable." Id. at 521.

Whitmore returned to Dr. Gruson for a follow-up appointment on January 10, 2017, five weeks after his surgery. Id. at 321. Dr. Gruson noted that Whitmore's gait pattern was normal, that there was no asymmetry, atrophy, effusions, laxity or instability in the upper extremities, and that he reported no pain with cervical range of motion. Id. The anterior shoulder incision was healed, and Dr. Gruson reported that he could passively elevate the right shoulder to 150º and externally rotate it to 30º. Id. There was a full elbow range of motion, and both the neurovascular status and sensation in the extremity were intact. Id. Radiographs of the right shoulder "demonstrate[d] a well-positioned total shoulder replacement." Id. Dr. Gruson recommended that Whitmore continue physical therapy and prescribed Percocet on an as-needed basis. Id. at 322.

Before Whitmore's next appointment with Dr. Gruson, he was in an accident and was taken to the emergency room for evaluation of right shoulder pain. Id. at 476. Whitmore was in the passenger seat of a vehicle that was hit by another vehicle traveling at a low speed. Id. He was wearing a seat belt at the time and the car's air bags were not deployed. Id. Emergency room personnel completed a radiography of the right shoulder and reported a "normally aligned right shoulder arthroplasty" with intact hardware. Id. at 478. Although the report noted some small soft tissue calcification, bone fragments, and loose bodies adjacent to the right shoulder socket, it stated that these irregularities were probably chronic. Id.  The report did note some soft tissue edema in the right supraclavicular and the right shoulder. Id.

On March 28, 2017, Whitmore returned to Dr. Gruson for his three-and-a-half-month follow-up appointment. Id. at 473. Since the accident, Whitmore had begun experiencing pain in the posterior aspect of his arm radiating to his right wrist, which he described as moderate to severe in intensity and sharp in nature. Id. When Dr. Gruson performed a Spurling test, Whitmore reported right trapezius and posterior arm pain. Id.  Dr. Gruson noted that he could passively elevate the right shoulder to 150º and externally rotate the shoulder to 35º. Id. at 474. Dr. Gruson's exam of the left shoulder was unremarkable. Id.  He concluded that the pain appeared to be emanating from the cervical spine and referred Whitmore for an MRI. Id.

Whitmore's next appointment with Dr. Gruson was on May 9, 2017. Id. at 484. Dr. Gruson wrote that the MRI, which had been performed two weeks prior, demonstrated a disc bulge but no frank disc herniation.[1] Id. at 485. Although he still experienced discomfort at night and some pain with repetitive use of the right shoulder, Whitmore's neck pain was improving. Id.

---

[1] The MRI found some straightening of the cervical lordosis, which the examiner speculated was related to muscle spasm, and a mild diffuse disc bulge at C6–C7 causing compression of the ventral aspect of the thecal sac. R. 472. The exam was otherwise normal. Id.

at 484. When Dr. Gruson repeated the Spurling test, Whitmore did not report any pain. Id. Dr. Gruson noted some mild pain with the cervical range of motion. Id. The trapezius was tender to palpation on both sides. Id. at 485. Dr. Gruson reported that Whitmore could actively elevate his right shoulder to 90º, although Dr. Gruson could passively elevate the shoulder to 130º with some pain and rotate it to 40º externally and internally with pain at the extremes. Id.  He referred Whitmore for continued physical therapy and recommended the use of anti-inflammatories or Tylenol as needed for pain.[2] Id.

Whitmore returned to Dr. Gruson for a follow-up appointment on January 8, 2019. Id. at 839. Whitmore told Dr. Gruson that he continued to suffer from pain in his right shoulder, including pain at night and pain with abduction of the shoulder, and that he could not lift anything heavy with his right arm. Id. Dr. Gruson's physical exam found that Whitmore's gait pattern was normal, and found no asymmetry, atrophy, effusions, laxity, or instability in the upper extremities. Id. No pain was associated with the cervical range of motion. Id. Dr. Gruson noted tenderness of the right trapezius to palpation. Id. at 840. Whitmore could actively elevate his right shoulder to 90º, and Dr. Gruson could passively elevate the shoulder to 140º, although Whitmore could not hold the position. Id.  Whitmore could rotate his shoulder externally and internally to 35º with pain at the extremes. Id.  Dr. Gruson reported that Whitmore's strength in elevation and external rotation was 5/5 with some pain on resistance. Id. The exam was otherwise unremarkable. Dr. Gruson concluded that Whitmore had reached maximal medical improvement and could use his right shoulder "without restrictions." Id.  He did not recommend further physical therapy and prescribed the use of anti-inflammatories or Tylenol as needed. Id.

---

[2] Whitmore attended physical therapy throughout 2017 with the goal of alleviating pain and increasing function in his right shoulder. R. 351–53, 371. Although the therapist noted some improvements in the range of motion in his right shoulder (Id. at 381, 671), his attendance was inconsistent, and he still experienced limitations of motion and pain. Id. at 381–84.

### 3.  Dr. Benjamin Berenfeld

On September 27, 2017, Whitmore met with Dr. Benjamin Berenfeld to address numbness and tingling in his right arm. R. 895. Whitmore reported that he had experienced these symptoms for more than 20 years, and that they had started to interfere with his activities of daily living and had resulted in a loss of strength in the hand. Id. Dr. Berenfeld's physical exam revealed no atrophy of the thenar eminence or hypothenar eminence, normal sensation in the distribution of the median nerve, normal sensation in the ulnar nerve and radial nerve, and a full range of motion of all the fingers without limitations. Id. at 896. A Durkin compression test performed to test for symptoms of carpal tunnel was negative. Id. Dr. Berenfeld's examination of the left hand was unremarkable. Id. However, an EMG demonstrated moderate right and mild left carpal tunnel syndrome.[3] Id. Dr. Berenfeld administered a therapeutic corticosteroid injection and instructed Whitmore to wear a cock-up splint at night. Id.

Whitmore returned for a follow-up appointment on October 25, 2017. Id. at 899. He reported that he had not seen any improvement in the numbness in the median nerve distribution in either hand as a result of the injection. Id.  Dr. Berenfeld noted significantly decreased sensation in the distribution of the median nerve, and the Durkin compression test was positive for symptoms of carpal tunnel. Id. Dr. Berenfeld scheduled Whitmore for right endoscopic carpal tunnel release surgery, which was performed successfully on November 9, 2017. Id. at 907–08. Following the surgery, Dr. Berenfeld reported to public assistance that Whitmore was "temporarily unemployable." Id. at 522.

---

[3] While it is unclear which EMG Dr. Berenfeld was referencing, an EMG requested by Dr. Gruson and performed on August 31, 2017, found moderate median nerve entrapment at the right wrist, mild median nerve entrapment at the left wrist, and asymptomatic ulnar nerve slowing across the elbows. R. 493–96.

At a subsequent appointment on November 22, 2017, Whitmore reported that he had fallen in the shower two weeks prior and injured his wrist, resulting in pain. Id. at 910. Dr. Berenfeld noted moderate tenderness to palpation in the distal radius and a slightly decreased range of motion in the right wrist, but no soft tissue swelling. Id. The incision appeared to be healing normally. Id. An x-ray revealed no abnormalities. Id. at 911. Dr. Berenfeld recommended the use of ice packs and nonsteroidal anti-inflammatory medications. Id.

At Whitmore's next appointment on March 21, 2018, he told Dr. Berenfeld that he continued to suffer from numbness and tingling in his right hand following the ulnar nerve distribution. Id. at 914. Both a Guyon canal compression test and cubital tunnel compression test were positive, and so Dr. Berenfeld referred Whitmore to an EMG/NCV to rule out compressive nerve syndrome. Id. at 914–15. Although the EMG showed improvement in the right median nerve following the carpal tunnel release surgery, Whitmore's left median nerve appeared to be enlarged, and the study indicated mild to moderate ulnar nerve entrapments at the elbows, marked enlargement of the ulnar nerves at the elbow bilaterally, and active and chronic denervation of the right first dorsal interosseous muscle. Id. at 586.

As a result, Dr. Berenfeld diagnosed Whitmore with right and left cubital tunnel syndrome, although he noted that the left side was asymptomatic. Id. at 918. Dr. Berenfeld performed a right endoscopic cubital tunnel release on May 17, 2018. Id. at 922. Following the surgery, Whitmore no longer reported pain and numbness in his arm. Id. at 925, 928, 932. Dr. Berenfeld noted that the incision was well-healed and, despite slightly reduced grip strength, Whitmore had a full range of motion in his right elbow. Id.

### 4.   Dr. Rajendra Rampersaud

In January 2017, Whitmore was referred to Dr. Rajendra Rampersaud for suspected obstructive sleep apnea. R. 847. Whitmore identified his symptoms as fatigue, non-restorative sleep, snoring, gastroesophageal reflux disease (GERD), headaches, apnea, waking due to gasping or choking, daytime naps, and frequent nocturnal awakenings. Id. Dr. Rampersaud referred Whitmore to a sleep study. Id. at 848. The sleep study confirmed that Whitmore suffered from severe Obstructive Sleep Apnea (OSA), with an apnea-hypopnea index (AHI) of 77.7. Id. at 331, 849. Whitmore was fitted for a continuous positive airway pressure (CPAP) machine, and Dr. Rampersaud recommend that he lose weight, avoid depressant substances at bedtime, and refrain from activities requiring sustained vigilance, such as driving and operating dangerous machinery. Id. at 849-50, 852, 876. Dr. Rampersaud encouraged Whitmore to use the machine every night for at least four or more consecutive hours. Id. at 850.

Whitmore met with Dr. Rampersaud at least eight more times between May 2017 and December 2018 to monitor his use of the CPAP machine. Id.at 853, 855, 857, 859, 862, 864, 866, 868. Whitmore was initially non-compliant with treatment, complaining that the machine's mask was uncomfortable and did not fit his face properly. Id. at 857, 859. After he was fitted for a new mask, Whitmore's use of the CPAP machine improved significantly. By December 2018, Whitmore used the machine 90% of the time, averaging a total of six hours 33 minutes per day. Id. at 868. He reported good sleep, denied any problems, and told Dr. Rampersaud that he could no longer sleep without the CPAP machine. Id.

### 5.   Dr. Kayode O. Olowe

Whitmore underwent a colonoscopy on October 31, 2016. R. 314. Scattered diverticula were found in the entire colon, and one 25-millimeter subepithelial nodule was found. Id. The

11

examination was otherwise normal. A second procedure performed on December 16, 2016,

located an additional subepithelial lesion. Id. at 317. The nodule was removed and subsequently

found to be benign. Id. at 317, 338.

### C. Consultative Medical Opinion Evidence

#### 1. John Fkiaras, M.D.

Dr. Fkiaras, a consultative examiner with Industrial Medical Associates, performed an

internal medicine examination on April 2, 2017. R. 338. Whitmore rated the pain in his right

shoulder an 8 out of 10 and described it as a throbbing pain radiating to the right upper

extremity. Id. He rated the pain in his neck a 5 out of 10 and described it as shooting pain that

also radiated through his arm. Id. Whitmore told Dr. Fkiaras that he has difficult lifting any

amount of weight. Id. In addition to his OSA diagnosis, Whitmore reported that he had been

diagnosed with Bell's Palsy, which caused mild drooping of his left face and left eye twitching,

and hyperlipidia and hypertension, both of which were managed with oral medication. Id. at

338–39. He denied doing any cooking but stated that he cleaned and did laundry once a week,

shopped once a month, showered and dressed daily, and watched TV and listened to the radio.

Id. at 339.

Dr. Fkiaras proceeded to the physical examination. He noted that Whitmore's gait was

normal, that he could walk on heels and toes without difficulty, fully squat, stand normally, used

no assistive devices, needed no help changing for the exam or getting on and off the exam table,

and was able to rise from the chair without difficulty. Id. at 340. His cervical spine showed

flexion and extension of 25º, lateral flexion to the right 30 degrees and to the left 35 degrees, and

rotary movement of 60º to the right and 70º to the left. Id. Whitmore reported pain to palpation of

the cervical spine. Id. Whitmore had a full range of motion in his lumbar spine. Id. Dr. Fkiaras

recorded forward elevation and abduction of the right shoulder to 50º, adduction and internal rotation of the right shoulder to 10º, and external rotation of the right shoulder to 30º. Id. at 340–41. The left shoulder had a full range of motion. Id. at 341. Although Dr. Fkiaras rated Whitmore's right arm strength a 2 out of 5, he evaluated his muscle strength in the remaining extremities a 5 out of 5. Id.

Dr. Fkiaras concluded that Whitmore was restricted from any lifting, carrying, pushing, and pulling, as well as activities that require reaching with the right lower extremity. Id. He determined that Whitmore has a moderate limitation looking to the right, a moderate to severe limitation looking up and down, and a mild to moderate limitation looking to the left. Id. at 342. He recommended that Whitmore be restricted from driving and operating machinery, activities that require exposure to unprotected heights, and activities that require use of the right arm and shoulder. Id. Lastly, he stated that Whitmore had moderate to severe schedule disruptions. Id.

### 2.   Daniel J. Feuer, M.D.

Dr. Feuer performed a neurological examination on January 17, 2018. R. 940. Whitmore told Feuer that although he still suffered from pain in his right shoulder and hand, he no longer suffered from focal numbness. Id. Dr. Feuer noted that Whitmore mounted and dismounted the examination table without assistance. Id. at 941. Whitmore's cervical spine range of motion was normal. Id. at 942. Dr. Feuer recorded some mild restrictions in the range of motion in the lumbosacral spine, reporting that flexion could be performed to 57º, right lateral flexion to 22º, and left lateral flexion to 23º. Id. Although tenderness was present in the right shoulder, Dr. Feuer stated that Whitmore "did not provide a full effort in form of power testing of the right shoulder secondary to pain." Id. at 942. Dr. Feuer concluded that "the neurological examination is within normal limits," and that there were "no objective clinical deficits referable to the central

or peripheral nervous system to support his subjective complaints." Id. He wrote that Whitmore "does not demonstrate any objective neurological disability or neurologic permanency which is causally related to" the March 2017 car accident, and that he "is neurologically stable and able to engage in full active employment as well as full activities of daily living without restrictions." Id. at 942-43.

## IV.   The ALJ's Decision

On April 26, 2019, the ALJ denied Whitmore's application for DIB. R. 81–94. At step one, he determined that Whitmore had not engaged in any substantial gainful activity since November 24, 2015. Id. at 83.

At step two, he found that Whitmore's obesity, obstructive sleep apnea, degenerative changes in the AC joint status post right shoulder arthroplasty, degenerative disc disease in the cervical spine, right ulnar nerve and median entrapment, status post right cubital tunnel release, and status post right carpal tunnel release qualified as severe impairments. Id. at 84. The ALJ determined that Whitmore's Bell's Palsy was nonsevere, reasoning that no significant treatment was documented following the alleged onset date. Id. The ALJ also concluded that Whitmore's left cubital tunnel syndrome, which was asymptomatic, and dysthymic disorder were nonsevere. Id. Noting that Whitmore's attorney mentioned his history of anxiety and depression, the ALJ explained that this history was not substantiated by the medical evidence of record: instead, treatment notes routine describe Whitmore's memory, speech, and concentration as within normal limits. Id. Applying the paragraph B criteria, the ALJ reasoned that any determinable mental impairment caused no more than "mild" limitation and found that the claimed impairment was nonsevere. Id. at 85.

At step three, the ALJ determined that Whitmore did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the applicable regulations. Id.; see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. Specifically, the ALJ found that the requirements of Listings 1.02, 1.03, 1.04, 1.08, and 11.08 were not satisfied. R. 85–86. Regarding Listing 1.02, the ALJ reasoned that the listing requires a finding of a gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion resulting in an inability to perform fine and gross movements effectively, and Whitmore had failed to demonstrate that he had the degree of difficulty in performing fine and gross movements as defined in the regulations. Id. The ALJ further concluded that Whitmore did not meet the requirements of Listing 1.03 because the medical record did not indicate that Whitmore could not ambulate effectively. Id. at 86. The ALJ also considered whether Listing 1.04 applied but stated that none of the subsections applied because there was no loss of strength in the lower extremities, no positive-straight leg-raising tests, no objective evidence of a diagnosis of spina arachnoiditis, and no evidence that Whitmore could not ambulate effectively without an assistive device. Id. Turning to Listing 1.08, the ALJ stated that there was no evidence indicating that he met the requirements and noted that Dr. Gruson had recently written that Whitmore could use his right upper extremity without restriction. Id. The ALJ rejected Whitmore's claim that he met the requirements of Listing 11.08, reasoning that his cervical spine disorder "began years before his alleged onset date and before he stopped engaging in substantial gainful activity" and "he was able to stand from a seated position during consultative examination with no issues." Id. Lastly, the ALJ noted that although there is no listing criteria specific to the evaluation of obesity impairments, obesity can have an adverse impact upon co-

existing impairment and as such was taken into account in his disability determination. Id. at 86–87.

The ALJ next established Whitmore's residual functional capacity ("RFC"). R. 87–92. The ALJ found that he had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except he could lift and/or carry 20 pounds occasionally and 10 pounds frequently. Id. at 87. The ALJ further determined that Whitmore could sit six hours in an eight-hour workday and stand and/or walk a total of six hours in an eight-hour workday, occasionally climb ramps and stairs, and balance or stoop. Id. However, he could never climb ladders, ropes or scaffolds or crouch, kneel or crawl. Id. While Whitmore could not perform overhead reaching with his right dominant upper extremity, he could frequently reach in all other directions with his right dominant upper extremity. Id. He could frequently handle and finger with his right dominant hand. Id. However, he was required to avoid concentrated exposure to vibration and hazards such as dangerous machinery and unprotected heights and could never drive vehicular equipment. Id.

Although the ALJ concluded that Whitmore's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements regarding the severity of his symptoms during his hearing testimony were inconsistent with the objective medical evidence of record. Id. at 88. The ALJ gave little weight to Dr. Fkiaras's medical opinion because "he only examined the claimant one time and his opinions appear to be based largely on the claimant's subjective complaints." Id. at 91. The ALJ gave "some weight" to Dr. Gruson's medical opinion given his status as a treating physician, although the ALJ misstated his opinion, claiming that Dr. Gruson had assessed that Whitmore "could not use his right shoulder without restrictions" when he had in fact written that Whitmore "*may* use his right shoulder without

restrictions." Id.; see also R. 840 (emphasis supplied). The ALJ gave no weight to Dr. Gruson

and Dr. Berenfeld's statements that Whitmore was temporarily unemployable post-surgery,

noting that these were "temporary restrictions that do not last for the duration of the alleged

period of disability." Id. at 91. Finally, the ALJ wrote that he had given no weight to an off-work

note issued following Whitmore's 2011 shoulder surgery because he had "returned to work for

several years after this note was written and prior to his alleged onset date." Id. at 92.

At step four, given Whitmore's RFC, the ALJ determined that he was unable to perform

any past work. Id. At step five, he concluded that Whitmore was capable of working as a small

parts assembler, cashier, or electronic worker. Id. at 93. As such, Whitmore had not been under a

disability during the applicable period and was not entitled to DIB. Id. at 94.

## LEGAL STANDARD

### I.    Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An

ALJ's determination may be set aside only if it is based upon legal error or it is not supported by

substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v.

Chater, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362

F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The

Commissioner's findings as to any fact supported by substantial evidence are conclusive. Diaz v.

Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir.

1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." (emphasis in original) (citations and internal quotation marks omitted)). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." See Rosa, 168 F.3d at 77.

## ANALYSIS

Whitmore argues that the ALJ incorrectly determined that he did not meet the requirements for Listing 11.08, and that the ALJ erred in failing to call a medical expert to render opinions regarding his medical conditions. Pl. Br. at 6. He further contends that the ALJ's decision was not supported by substantial evidence, and that "the entirety of the record including plaintiff's testimony and the medical records support a finding that the plaintiff was incapable of performing sedentary work." Id. at 9. The Commissioner responds that the ALJ's decision was based on substantial evidence and was free of legal error. Def. Br. at 13.

## I.   The ALJ's Determination that Whitmore's Impairments did not Satisfy the Severity of the Listed Impairments

Listing 11.08 concerns spinal cord disorders, which "may be congenital or caused by injury to the spinal cord." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 11.00 (M)(1). The regulations note that "[m]otor signs and symptoms of spinal cord disorders include paralysis, flaccidity, spasticity, and weakness." Id. To satisfy the requirements of Listing 11.08, a claimant must show: (A) "[c]omplete loss of function . . . persisting for three consecutive months after the

disorder; or (B) "[d]isorganization of motor function in two extremities . . . resulting in an extreme limitation in the ability to stand from a seated position, balance while standing or walking, or use the upper extremities persisting for three consecutive months after the disorder"; or (C) "[m]arked limitation . . . in physical functioning . . . and in one or more of the . . . areas of mental functioning, both persisting for three consecutive months after the disorder." 20 C.F.R. Pt. 404, subpt. P, app'x 1 §§ 11.08 (A)–(C). A complete loss of function is defined as "a complete lack of motor, sensory, and autonomic function of the affected part(s) of the body." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 11.00 (M)(2). In contrast, a disorganization of motor function involves the reduction, but not the elimination, of motor, sensory, and autonomic function.  20 C.F.R. Pt. 404, subpt. P, app'x 1 § 11.00 (M)(3).

The ALJ correctly determined that Whitmore does not have a spinal cord disorder as defined by Listing 11.08. There is no evidence in the record indicating that Whitmore ever suffered a complete loss of function caused by spinal injuries as required by 11.08 (A). Nor is there evidence that Whitmore exhibited an extreme limitation in his ability to stand from a seated position, balance while standing or walking, or use the upper extremities or a marked limitation in physical functioning.[4] Physical examinations routinely noted that his gait was normal, that he did not require any assistive device, and that he was able to get on and off examining tables and stand up from chairs without assistance. R. 321, 340, 473, 484, 839. While Dr. Gruson's treatment notes document a reduction in the range of motion in Whitmore's right shoulder, he found that there was no atrophy, laxity, or instability in the extremities and that sensation was

---

[4] The regulations defines physical functioning as "specific motor abilities, such as independently initiating, sustaining, and completing the following activities: Standing up from a seated position, balancing while standing or walking or using both your extremities for fine and gross movements." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 11.00 (G)(3)(a). A "marked limitation" is defined as a serious limitation "in the ability to independently initiate, sustain, and complete work-related physical activities." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 11.00 (G)(2)(a).

grossly intact. Id. at 321, 473–74, 484–85, 839–40. Similarly, although Dr. Fkiaras found that

Whitmore's range of motion and strength in his right shoulder was reduced, he noted that he

retained full strength in the remaining extremities and his hand and finger dexterity were intact.

Id. at 341. In addition, neither the treating nor the consultative physicians suggest that Whitmore

was impaired in his ability to understand, remember, or apply information, interact with others,

concentrate, persist or maintain pace, or adapt and manage himself as contemplated by 11.08(C).

Of note, an MRI performed after Whitmore's March 2017 accident identified only two

abnormalities: a straightening of the cervical lordosis and a mild diffuse disc bulge in the

cervical spine. R. 472.

The ALJ's determination regarding the remaining listings is similarly supported by

substantial evidence. Listing 1.02, which relates to major dysfunction of a joint, requires either a

showing that the claimant is unable to ambulate effectively or is unable to perform fine and gross

movements effectively. See 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 1.02. As explained above,

Whitmore demonstrated no difficulties with ambulation or with fine or gross movements.

Similarly, Listing 1.03, which concerns reconstructive surgery or surgical arthrodesis of a major

weight-bearing joint, applies where the claimant is unable to ambulate effectively. See id. § 1.03.

Listing 1.04 applies to disorders of the spine, including degenerative disc disease, and requires

evidence of nerve root compression, a diagnosis of spinal arachnoiditis, confirmed by an

operative note or pathology report of tissue biopsy, or a lumbar spinal stenosis resulting in an

inability to ambulate effectively. See id. § 1.04. Whitmore's medical records documenting his

treatment following his car accident in October 2010 do provide some evidence of nerve root

compression (R. 526–27, 529–31, 545), but these records pre-date his alleged onset date by

several years, and, as the ALJ correctly noted, he continued to engage in substantial gainful

activity. Although both consultative examiners noted a reduced range of motion in Whitmore's spine (R. 341, 942), there is no other evidence of nerve compression from the relevant period, and Whitmore has neither been diagnosed with spinal arachnoiditis nor spinal stenosis and does not exhibit the symptoms of either condition. See 20 C.F.R. Pt. 404, subpt. P, app'x 1 §§ 1.04 (A)–(C). Finally, there is no evidence of a soft tissue injury under continuing surgical management as contemplated by Listing 1.08.

Whitmore also asserts, without citations to any supporting authority, that Social Security Administration policy and the Hearings, Appeals, and Litigation Law Manual ("HALLEX") mandate that the ALJ obtain a medical expert. Pl. Br. at 8. However, the regulations in effect at the time of Whitmore's application provided only that an ALJ "*may* also ask for and consider opinions from medical experts . . . on whether [the claimant's] impairment(s) equals the requirements of any impairment listed in appendix (1)." 20 C.F.R. § 404.1527(e)(2)(iii) (effective Aug. 24, 2012 to Mar. 26, 2017) (emphasis added). As such, "it is within the ALJ's discretion to obtain he opinion of a medical expert in order to determine whether a claimant's impairments meet or equal a particular listing." Distefano v. Berryhill, 363 F. Supp. 3d 453, 470 (S.D.N.Y. 2019). HALLEX similarly indicates that the decision whether to call a medical expert is discretionary when the ALJ "[d]etermines whether a claimant's impairment(s) meets a listed impairment(s)." HALLEX I-2-5-34(2). While such opinions may be beneficial where the medical record is not fully developed, "'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history,' as was true here, 'the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" Distefano, 363 F. Supp. 3d at 471 (quoting Rosa, 168 F.3d at 79 n.5). As such, the ALJ was not required to call a medical expert at Whitmore's hearing.

II.     **The ALJ's Determination Regarding Whitmore's Credibility**

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of his impairment. See Tejada v. Apfel, 167 F.3d 770, 775–76 (2d Cir. 1999); see also 20 C.F.R. § 404.1529(b) (dictating than an individual's subjective complaints alone do not constitute conclusive evidence of a disability). In making a credibility determination, if a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should "consider all available evidence," including the claimant's daily activities, the location, nature, extent, and duration of his symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. Cichocki v. Astrue, 534 F. App'x 71, 75–76 (2d Cir. 2013) (citing 20 C.F.R. § 416.929(c)(2)); 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

The ALJ correctly determined that Whitmore's statements "regarding the severity of his symptoms are inconsistent with the objective medical evidence of record." R. 88. Whitmore testified that he experienced near constant pain in his right shoulder, hand, and elbow and claimed that he could not move his arm above his head. Id. at 118–19. He also testified that he could not carry anything with his right arm and numbness in his right hand prevented him from performing basic tasks. Id. at 120–21. Dr. Gruson noted that radiographs indicated that the shoulder replacement was "well-positioned," and wrote that Whitmore could elevate his shoulder overhead to 90° and, with assistance, could rotate his shoulder to 140°. Id. at 840. Furthermore, Dr. Gruson recommended conservative pain management treatments, such as use of anti-inflammatory drugs and Tylenol as needed. Id.; see also Whitfield v. Astrue, No. 08-cv-6427, 2010 WL 2925962, at *6 (W.D.N.Y. July 23, 2010) (finding that ALJ's credibility determination

was supported by substantial evidence where objective medical imaging did not substantiate allegations of severe pain and claimant was consistently treated with a conservative pain management plan). Although Whitmore's pain appeared to improve with physical therapy, he attended inconsistently. R. 381, 383, 671, 839; see also Kuchenmeister v. Berryhill, No. 16-cv-7975 (HBP), 2018 WL 526547, at *18 (S.D.N.Y. Jan. 19, 2018) (noting that "[a] claimant's adherence to treatment once it is prescribed is a pertinent factor in evaluating the credibility of claimant's statements concerning the intensity, persistence and limiting effect of his pain or other symptoms"). Furthermore, following his carpal and cubital tunnel release surgeries, Whitmore told Dr. Berenfeld that he no longer experienced numbness in his arm and hand. Id. at 925, 928, 932; see also Pellam v. Astrue, 508 F. App'x 87, 91 (2d Cir. 2013) (holding that ALJ did not err in assessing claimant's credibility where her hearing testimony was inconsistent with her statements to treating physicians).

As a result, the ALJ's determination that Whitmore's testimony regarding the severity of his symptoms was inconsistent with other evidence in the record was adequately supported. Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (reasoning that credibility was supported by substantial evidence where the ALJ noted inconsistencies in claimant's testimony, cited to evidence showing that claimant was relatively "mobile and functional," and concluded that the allegations contradicted the record).

### III. The ALJ's Determination Regarding Whitmore's RFC

Plaintiff bears the burden of proving that a more restrictive RFC is appropriate. Smith v. Berryhill, 740 F. App'x 721, 726 (2d Cir. 2018). Although Whitmore contends that the entirety of the record supports a finding that he was incapable of performing sedentary work, he fails to cite to any specific evidence that supports his contention. This fact alone could constitute

substantial evidence supporting a denial of benefits. Barry v. Colvin, 606 F. App'x 621, 622 (2d Cir. 2015) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits.").

The ALJ's RFC determination was, however, supported by substantial evidence. First, the ALJ correctly afforded little weight to Dr. Fkiaras's medical opinion on the basis that he only examined claimant once, his opinions were inconsistent with the findings of his physical examination and other medical evidence in the record, and his opinion that Whitmore should be restricted from any lifting, carrying, pushing, and pulling and that he had a moderate to severe limitation looking to the right appeared to rely on Whitmore's subjective complaints of pain. Pellam, 508 F. App'x at 89–90; Meyer v. Comm'r of Soc. Sec., 794 F. App'x 23, 26 (2d Cir. 2019) (concluding that ALJ gave "good reasons" for giving physician's opinion "little weight" where he heavily relied on the claimant's self-reported symptoms and the evaluations did not reflect "symptomatic improvement"). Although the ALJ arguably erred in failing to give controlling weight to Dr. Gruson's medical opinion as a treating physician, this error is harmless because Dr. Gruson stated that Whitmore could use his right shoulder without restriction. Walzer v. Chater, No. 93-cv-6240 (LAK), 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) (reasoning that failure to discuss treating physician's report was harmless error because it would not have changed the outcome of the ALJ's decision); see also Franco v. Saul, No. 16-cv-5695 (LMS), 2020 WL 4284157, at *16 (S.D.N.Y. July 27, 2020). The ALJ also failed to explicitly consider Dr. Feuer's medical opinion, but this error is similarly harmless because Dr. Feuer concluded that Whitmore did not "demonstrate any objective neurological disability or neurologic permanency" and opined that he was "able to engage in full active employment as well as full

activities of daily living without restrictions," and so would not have changed the outcome of the ALJ's decision. R. 942–43.  Finally, the ALJ appropriately declined to give any weight to Dr. Gruson and Dr. Berenfeld's notes that Whitmore was "temporarily unemployable" following his surgeries, as the determination that a claimant is "disabled" or "unable to work" is "reserved to the Commissioner." 20 C.F.R. § 404.1527 (d)(1); see also Distefano, 363 F. Supp. 3d at 473.

The ALJ's conclusion that Whitmore was capable of light work with certain restrictions was also amply supported in the record. Although treatment notes indicate that Whitmore's right arm and grip strength were reduced and his range of motion in his shoulder was slightly limited, the shoulder surgery and carpal and cubital tunnel release surgeries were largely successful, such that Dr. Gruson opined that Whitmore could use his right shoulder "without restriction." See Mancuso v. Astrue, 361 F. App'x 176, 178 (2d Cir. 2010) (reasoning that ALJ's finding that claimant could perform light work was supported by objective evidence from physical examinations, which demonstrated that she had full range of motion and strength in her upper and lower extremities, ability to walk without difficulty, and lack of muscle atrophy). The ALJ appropriately considered Whitmore's limitations resulting from his shoulder impairment in crafting the RFC, limiting the amount he could lift or carry, noting his inability to perform overhead reaching with his right arm, and providing that he could "frequently" reach with his right arm. Velez v. Comm'r of Soc. Sec., No. 16-cv-10036 (ER)(HBP), 2017 WL 6761925, at *19 (S.D.N.Y. Dec. 12, 2017) (holding that ALJ properly took plaintiff's reduced strength and range of motion in his shoulder into account in limiting him to light work with additional restrictions). In addition, "the ALJ took into account [Whitmore's] testimony about his carpal tunnel syndrome by limiting [him] to only 'frequently' grasping and fingering" with his right hand and noting that he should avoid concentrated exposure to vibration. Salerno v. Berryhill,

No. 19-cv-00627 (KHP), 2020 WL 882006, at *11 (S.D.N.Y. Feb. 24, 2020). Similarly, the ALJ accounted for Whitmore's OSA and obesity by restricting him from any exposure to dangerous machinery and unprotected heights and providing that he could never drive vehicular equipment. See Guadagno v. Saul, No. 18-cv-6437L, 2020 WL 1151332, at *2–*3 (W.D.N.Y. Mar. 10, 2020).

Accordingly, the ALJ's decision was supported by substantial evidence, and so Whitmore is not entitled to remand.

## CONCLUSION

The Commissioner's motion is GRANTED (ECF No. 31), the Plaintiff's motion is DENIED (ECF No. 27), and the case is DISMISSED.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     New York, New York
           March 31, 2022